**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**JAMEL MARTINEZ,**

                                            **Plaintiff,**                    **02-CV-0579(Sr)**

**v.**

**RICHARD AUGUSTINE, et al.,**

                                            **Defendants.**

_____

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment.  Dkt. #19.


Plaintiff filed this _pro se_ action on or about August 13, 2002 seeking relief pursuant to 42 U.S.C. § 1983.  Dkt. #1.  Plaintiff alleges that while an inmate at the Southport Correctional Facility ("Southport"), his rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution were violated.[1]  _Id_.  Currently before the Court is defendants' motion for summary judgment.  Dkt. #44.  For the

_____

[1] By Decision and Order dated October 10, 2002, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, United States District Judge Richard J. Arcara ordered that "all but plaintiff's Eighth Amendment claims against defendants Augustine, McLaughlin, Siuda, McKlevis, McKernan, O'Herron, Litwiler, Warren, MacIntyre, Carrigan, Dyer, Ameigh, Held, Rocco, Michalko and Bartach [sic] are dismissed with prejudice."  Dkt. #3, p.18.

following reasons, defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff, proceeding *pro se*, filed this action on or about August 13, 2002, against defendants Glenn S. Goord, Donald Selsky, M. McGinnis, R. Hazelton, Richard Cerio, W.E. Wilcox, Brian D. Chuttey, Richard Augustine, Richard E. McLaughlin, Richard M. Siuda, Wendy McKlevis, Dennis McKernan, James O'Herron, Jodi Litwiler, Michael P. Warren, Dean MacIntyre, G. Carrigan, B. Dyer, J. Ameigh, B. Held, Rocco, Michalko and Bartsch pursuant to 42 U.S.C. § 1983, seeking a declaratory judgment, compensatory and punitive damages. Dkt. #1. By Decision and Order dated October 10, 2002, United States District Judge Richard J. Arcara dismissed the claims against defendants Glenn Goord, Donald Selsky, Michael McGinnis, R. Hazelton, Richard Cerio, W.E. Wilcox, and Brian Chuttey with prejudice. Dkt. #3; *see also*, footnote 1, *supra*. Accordingly, only plaintiff's claims of excessive use of force and failure to protect against defendants Richard Augustine, Richard E. McLaughlin, Richard M. Siuda, Wendy McKlevis, Dennis McKernan, James O'Herron, Jodi Litwiler, Michael P.

Warren, Dean MacIntyre, G. Carrigan, B. Dyer, J. Ameigh, B. Held, Rocco[2], Michalko

and Bartsch remain. *Id.*

**Plaintiff's Complaint**

Plaintiff's claims all arise from an incident that occurred on June 24, 2000,

while he was incarcerated at Southport. Dkt. #1. Plaintiff alleges that at approximately

12:30 p.m., on June 24, 2000, he was advised that he had visitors. Dkt. #1, ¶ 12. Prior

to be being placed in the "caged-in area where inmates are designated to sit when in

the visiting area," plaintiff was pat-frisked twice and scanned with a hand-held metal

detector. *Id.* at ¶¶ 13-14. Plaintiff was placed in the caged-in area with approximately

six other inmates and while plaintiff was visiting with his family members, "a disturbance

occurred between a few inmates in the same caged-in visiting area as plaintiff." *Id.* at

¶ 16. Plaintiff alleges that the inmates involved in the disturbance used weapons either

supplied by their visitors or smuggled into the caged-in area by the inmates. *Id.* at ¶ 17.

Plaintiff alleges that "[d]uring the early moments of this disturbance, plaintiff received a

cut to his face and began to bleed profusely." *Id.* at ¶ 18. Plaintiff further claims that

---

[2] Defendants state in their Memorandum of Law that neither defendants nor their counsel are aware of anyone by the name "Rocco." The Court notes that although Docket No. 28 suggests that "Rocco" was served with a copy of the Summons and Complaint, the file maintained in the Clerk's Office does not contain a Return of Service for "Rocco." Defendants further assert that although service was not effectuated on "Rocco," predecessor counsel for defendants filed a motion for summary judgment and inadvertently filed the motion on behalf of "all defendants" and the Clerk of Court deemed that reference to include "Rocco." Notwithstanding the foregoing, defendants maintain that a judgment entered against "Rocco" would be meaningless and unenforceable. Accordingly, defendants request that this Court remove "Rocco" as a defendant in this action. *See* Dkt. #46, p.2. At this time and based on the record before it, this Court declines to grant defendants the relief requested.

despite his repeated requests for the officers to open the door (gate) of the caged-in area to let plaintiff out, the officers refused to open the door (gate). *Id*. at ¶ 20. As a result of the officers' refusal to open the door (gate), plaintiff continued to be attacked and he was stabbed and cut on his face, neck, torso and arms. *Id*. at ¶ 21.

Plaintiff further alleges,

24. [i]nstead of assisting plaintiff, the officers placed their batons in a horizontal position and began jabbing their batons through the holes in the cage which resulted in plaintiff being physically assaulted about his head, neck, and back.

25. One particularly forceful jab caught plaintiff in his head causing him to almost lose consciousness (including the blurring of his vision) and forcing him to fall to his knees placing his head on one of the tables in the visiting area.

26. The officers began yelling for the inmates in the caged area to lay on the floor and plaintiff attempted to comply. However, since plaintiff could not breathe in the prone position due to the numerous stab wounds and cuts sustained to his head, neck, and torso, plaintiff attempted to adjust himself into a position whereby he could breathe.

27. As plaintiff attempted to adjust his position on the floor, plaintiff was physically assaulted with batons by Defendant Augustine and others as they entered the caged-in portion of the visiting area.

28. During the course of this incident, additional officers responded to the visiting area in an effort to quell the disturbance.

29. Plaintiff was then thrown/dragged out of the caged-in area into the area just outside the caged-in area where the correctional officers are posted to observe the visiting area.

30. Plaintiff was pinned to the floor in the prone position with the defendant correctional officers holding plaintiff firmly to the floor by leaning on and applying pressure to plaintiff's back and neck with their feet.

31.  Plaintiff was bleeding profusely from his neck and was
unable to breathe due to the position he was in and the
pressure being applied to his back and neck by the defendant officers.

32.  While plaintiff was pinned to the floor, the defendant
officers began to verbally assault and to physically assault
plaintiff by yelling racial epithets and threats at plaintiff while
kicking plaintiff about the ribs and back.

*Id*. at ¶¶ 24-32.  As discussed above, only plaintiff's claims of excessive use of force

and failure to protect against defendants Augustine, McLaughlin, Siuda, McKlevis

Rocco, McKernan, O'Herron, Litwiler, Warren, MacIntyre, Carrigan, Dyer, Ameigh, Held,

Michalko and Bartsch remain and are before this Court.


In his excessive use of force claim, plaintiff alleges not only that

defendants used physical force against him without need or provocation, but that

defendants' failure to intervene to prevent the misuse of force constituted cruel and

unusual punishment.  Dkt. #1, ¶ 65.  Plaintiff's claim for failure to protect alleges that

defendants' failure to provide proper security measures, "such as proper and necessary

searching for weapons and the proper observation of the inmates in the highly

problematic Special Housing Unit facility, which allowed other inmates to cause serious

physical injury to plaintiff" constituted cruel and unusual punishment.  *Id*. at ¶ 61.

Moreover, plaintiff alleges that defendants' failure to intervene and rescue plaintiff by

opening the gate and allowing plaintiff to "escape the melee" resulted in plaintiff

sustaining further serious injuries and constituted cruel and unusual punishment.  *Id*. at

¶ 62.

## Defendants' Statement of Undisputed Facts

In contrast to the allegations in plaintiff's complaint, defendants maintain that only three defendants, Richard Augustine, Robert Michalko and Michael Warren, had any physical contact with plaintiff during the June 24, 2000 incident. Dkt. #46, p.5. Specifically, defendant Augustine was the first Corrections Officer to enter the Special Housing Unit ("SHU") visiting area pen to subdue the inmates and admittedly struck plaintiff across the back with his baton. Dkt. #45, ¶¶ 7-8; Dkt. #46, p.5. Defendant Warren assisted in securing plaintiff and thereafter, with the assistance of defendant Michalko, escorted plaintiff to the facility hospital. Dkt. #45, ¶¶ 41-56; Dkt. #46, p.6. Defendants argue that the amount of force used was not excessive, rather, it was "reasonably necessary to gain control of the situation, to restrain the plaintiff in order to maintain order, discipline, and security within the facility, and to protect themselves and others." Dkt. #46, p.2. Additionally, defendants claim that they did not fail to protect plaintiff from physical assault because, as defendants argue, plaintiff was "involved in the altercation at issue in this case and a participant in the physical assaults." Dkt. #46, p.2. Rather, defendants assert that they "stopped the violence and regained control of the situation as quickly as they were reasonably able." *Id*. As evidenced by the selected excerpts from plaintiff's complaint cited above, the allegations in plaintiff's complaint are of a general nature and do not specify which officer or officers plaintiff claims engaged in the alleged conduct. Conversely, defendants separately address each individual defendant and describe in detail what role, if any, each defendant played in connection with the June 24, 2000 incident. *See* Dkt. #45.

**<u>Richard Augustine</u>**

It is undisputed that defendant Augustine was on duty on June 24, 2000 and was assigned to Southport's SHU visiting room. Dkt. #45, ¶ 2. At or around 2:30 p.m., on June 24, 2000, a fight broke out in the visiting room among the inmates contained in pen number one. *Id*. at ¶ 3. Plaintiff was among those inmates involved in the incident. *Id*. Because he was assigned to the visiting room, defendant Augustine witnessed the incident and has also had the opportunity to review the videotape of the incident. *Id*. at ¶ 4.

After the fight commenced, defendant Augustine repeatedly gave orders to the inmates involved in the fight to stop fighting and to lie on the floor. *Id*. at ¶ 6. Defendant Augustine's initial recollection of the sequence of events that followed was that after initially ignoring his orders, the inmates eventually stopped fighting and complied with his orders to lie on the floor. *Id*. at ¶ 7. Thereafter, defendant Augustine recalled that the gate was opened and he and several other Corrections Officers entered the visiting room pen. *Id*. It was defendant Augustine's initial recollection that upon entering the visiting room pen, plaintiff began to get up from the floor in violation of the direct orders. *Id*. at ¶ 8. According to defendant Augustine's initial recollection, because of the weapons involved and in order to protect himself, defendant Augustine struck plaintiff across the back with his baton and plaintiff immediately fell to the floor. *Id*. Once plaintiff was subdued, defendant Augustine recalled continuing on into the visiting pen to subdue the other inmates. *Id*.

In his affidavit submitted in support of defendants' motion for summary judgment, defendant Augustine stated,

> Upon a subsequent review of the videotape on a large screen, it appears that Inmate Martinez eventually complied with the direct orders to lie on the floor, however, he got back up again and began fighting. When I came through the door, Inmate Martinez had gotten up and was standing and fighting with the other inmates; therefore, I struck him with my baton across his back ...

Dkt. #52, ¶ 10. Accordingly, it is undisputed that defendant Augustine struck plaintiff across the back with his baton. Dkt. #45, ¶ 12. However, contrary to plaintiff's allegations, defendant Augustine states that "at no time did he strike Inmate Martinez in the head area, nor is he aware of any other officer doing so." *Id*.

An investigation into the June 24, 2000 incident revealed that two weapons, a razor blade and a plexiglass shank, were smuggled into the visiting area by inmate Matos' mother who hid the weapons in a potato chip bag. *Id*. at ¶ 13. According to defendant Augustine, inmate Matos' mother gave the razor blade to her son and gave the plexiglass shank to inmate Lugo. *Id*. In addition, it was later discovered that inmate Richardson had smuggled a weapon into the visiting area in his rectum and retrieved the concealed weapon prior to the incident. *Id*. at ¶ 14. As described by defendant Augustine, all inmates were pat-frisked and scanned with a hand wand prior to entering the visiting room area, however, a hand wand cannot detect a weapon that is concealed in an anal cavity. *Id*. at ¶ 15. Defendant Augustine further states, "[t]oday, the State of New York has provided us with what is called a 'boss chair' which all inmates are required to slide their bottom across, prior to entering and leaving the

Visiting Room, which can detect weapons being concealed in an anal cavity or rectum. At the time of the incident, we did not have such a device (i.e. "Boss chair")." Dkt. #52, ¶ 16.

Consistent with New York State Department of Correctional Services' policy, following the incident, defendant Augustine filed a Use of Force Report describing the incident. Dkt. #45, ¶ 17. According to Superintendent McGinnis who signed the Use of Force Report, the amount of force used was appropriate for the incident. *Id*. at ¶ 18. In addition, on August 22, 2000, after reviewing the visiting room surveillance video, Sergeant Marker prepared a written statement stating that the video did not reveal a baton striking the back of plaintiff's head. *Id*. at ¶ 19. Sergeant Marker states that he did, however, observe defendant Augustine "utilizing his baton in a manner consistent with defending himself and the other officers." *Id*. Moreover, Sergeant Marker determined that the Use of Force medical examination revealed no evidence of plaintiff's head being struck by a baton, nor did plaintiff verbalize such a complaint to the medical staff. *Id*.

The gate to the visiting room is electronically controlled and only supervisors have the ability to authorize when the gate may be opened. *Id*. at ¶ 21. Accordingly, at no point did defendant Augustine or any of the other named defendants have the authority and/or ability to open the gate. *Id*. Here, once it was determined

that sufficient staff were present, the supervisor issued an order directing that the gate to the visiting pen be opened.  *Id*. at ¶ 22.


**Erich Bartsch**

On June 24, 2000, defendant Bartsch was assigned to the control room for the Southport visiting pens and the visiting area.  Dkt. #45, ¶ 25.  Specifically, defendant Bartsch was responsible for operating the gates from the main gallery to the visiting area and from the visiting area to the visiting pens.  *Id*.  Defendant Bartsch did not, however, have any contact with inmates nor was he responsible for frisking or searching inmates.  *Id*. at ¶ 26.  In support of defendants' motion for summary judgment, defendant Bartsch states,

> [w]hile in the control room, my job is to properly identify the inmate being processed into the visiting room and to operate certain gates.  To maintain the safety and security of the facility, I am absolutely prohibited from opening the gates to the visiting pens if an incident occurs, unless ordered to do so by the area supervisor.

Dkt. #47, ¶ 5.  After the fight broke out, the Sergeant ordered defendant Bartsch to open the gate to the visiting pens to allow the Corrections Officers who responded to the incident to enter the area.  *Id*. at ¶ 6.  Defendant Bartsch complied with the Sergeant's order and had no other involvement in the incident.  *Id*.

**<u>Gregory Carrigan</u>**

On June 24, 2000, defendant Gregory Carrigan responded to the SHU visiting room because there was a disturbance. Dkt. #45, ¶ 31. In his affidavit submitted in support of defendants' motion for summary judgment, defendant Carrigan stated that when he arrived at the SHU visiting room, he observed a number of inmates fighting in pen number one of the SHU visiting room and plaintiff was among those inmates involved in the incident. *Id*. at ¶ 32. As discussed above, numerous orders were given to the inmates to stop fighting and to lie on the floor. *Id*. at ¶ 34. After further orders were given and sufficient staff arrived to assist, defendant Carrigan, along with defendant Augustine and others, entered the visiting room. *Id*. Thereafter, defendant Carrigan assisted defendant Augustine in attempting to control inmate Matos. *Id*. at ¶ 35. Inmate Matos struggled violently and broke free from defendants Augustine and Carrigan and struck defendant O'Herron in the chest. *Id*. After a struggle, defendants Augustine and Carrigan were able to regain control of inmate Matos and defendants Augustine and Carrigan escorted inmate Matos to the frisk area. *Id*. at ¶¶ 35-36. Inmate Matos was able to break free of defendant Carrigan's hold of his left arm and turned and punched defendant Augustine in the right eye. *Id*. at ¶ 37. Thereafter, defendants Augustine and Carrigan were able to subdue Inmate Matos. *Id*. At no time did defendant Carrigan have any contact with plaintiff. *Id*. at ¶ 38. As discussed above, defendant Carrigan was not able to open the gate to the visiting area. *Id*. at ¶¶ 39-40.

**Robert Michalko**

On June 24, 2000, defendant Michalko was neither assigned to nor present at the visiting room when the incident occurred. Dkt. #45, ¶ 42. In fact, defendant Michalko did not enter the visiting room with the other officers to restrain any of the inmates; defendant Michalko arrived just after the officers entered the visiting room and secured the inmates. *Id*. Defendant Michalko did not observe any officer throw plaintiff down or hold plaintiff down with their feet. *Id*. at ¶ 44. Moreover, defendant Michalko did not hear any racial epithets or threats made towards plaintiff, nor did defendant Michalko see anyone kick plaintiff. *Id*. at ¶ 45. Defendant Michalko's only involvement in the June 24, 2000 incident was to assist defendant Warren in escorting plaintiff, after he had already been subdued, to the facility hospital. *Id*. at ¶ 46. The only contact defendant Michalko had with plaintiff was limited to the amount of contact required in order to escort him to the facility hospital. *Id*. at ¶ 47.

**Michael Warren**

On June 24, 2000, defendant Warren had just concluded his shift in C-Block and was leaving the facility when he responded to an alert to report to the SHU visiting room because of a disturbance. Dkt. #45, ¶ 50. When defendant Warren arrived at the SHU visiting room, he observed inmates fighting with weapons and refusing direct orders to stop fighting. *Id*. at ¶ 51. Defendant Warren proceeded to line up behind the other Corrections Officers who had responded to the incident and when the Sergeant (supervisor) ordered the gate to be opened, he entered the visiting room

behind a few other officers.  *Id*.  After entering the visiting room, defendant Warren

noticed plaintiff on the floor and defendant Warren secured him until the visiting room

was secured.  *Id*. at ¶ 52.  At no time did defendant Warren strike plaintiff.  Rather,

defendant Warren's only involvement was to secure plaintiff and assist defendant

Michalko in escorting plaintiff to the facility hospital.  *Id*. at ¶ 53.  Upon his arrival at the

facility hospital, plaintiff was immediately seen by medical staff.  *Id*.  Thereafter,

defendant Warren was sent to St. Joseph's Hospital for treatment for blood exposure.

*Id*. at ¶ 54.  Finally, as discussed above, at no time was defendant Warren able to open

the gate to the SHU visiting room.  *Id*. at ¶ 55.


### **Richard McLaughlin**

On June 24, 2000, defendant Richard McLaughlin responded to the SHU

visiting room because of a fight between the inmates.  Dkt. #45, ¶¶ 58-59.  When

defendant McLaughlin arrived at the SHU visiting room other Corrections Officers were

already in the SHU visiting room and defendant McLaughlin assisted defendant Siuda

in applying restraints to inmate Richardson.  *Id*. at ¶ 60.  Defendant McLaughlin then

assisted in escorting inmate Richardson to the frisk area.  *Id*.  At no time did defendant

McLaughlin have any contact with plaintiff; the only inmate defendant McLaughlin had

any contact with was inmate Richardson.  *Id*. at ¶ 61.  Thereafter, defendant

McLaughlin was sent to St. Joseph's Hospital for treatment for blood exposure.  *Id*. at

¶ 62.  As discussed above, at the time defendant McLaughlin arrived at the SHU visiting

room, the gate was open.  *Id*. at ¶ 64.  Moreover, defendant McLaughlin was not able to

open the gate to the SHU visiting room because only a supervisor may authorize the
opening of the gate.  *Id*. at ¶ 63.


### Dennis McKernan

On June 24, 2000, defendant McKernan responded to the SHU visiting
room because of reports of a disturbance.  Dkt. #45, ¶ 67.  When defendant McKernan
arrived, he observed a number of inmates, including plaintiff, fighting in pen number
one of the SHU visiting room.  *Id*. at ¶ 68.  Defendant McKernan entered the visiting
room with a number of other Corrections Officers and immediately ordered inmate
Ellisano to lie on the floor; inmate Ellisano did not comply with defendant McKernan's
order.  *Id*. at ¶¶ 70-71.  Because defendant McKernan believed that inmate Ellisano
may have had a weapon and in an effort to gain control of inmate Ellisano and to
protect himself and the other officers, defendant McKernan struck inmate Ellisano with
his baton.  *Id*. at ¶ 71.  Thereafter, inmate Ellisano complied with the orders to lie on the
floor.  *Id*.  Defendant McKernan and Correctional Officer Lovejoy later escorted inmate
Lugo to the facility hospital.  *Id*. at ¶ 73.  At no time did defendant McKernan have any
contact with plaintiff.  *Id*. at ¶ 72.  As discussed above, defendant McKernan was not
able to open the gate to the visiting room.  *Id*. at ¶ 74.


### Richard Siuda

On June 24, 2000, Richard Siuda responded to a notification that a fight
had broken out in the SHU visiting room.  Dkt. #45, ¶ 78.  Defendant Siuda, along with

defendant Augustine was among the first officers to enter the visiting room after the supervisor authorized the gate to be opened.  *Id*. at ¶ 80.  As discussed above, defendant Augustine gave several direct orders to the inmates to stop fighting and to lie on the floor.  *Id*. at ¶ 81.  Notwithstanding these orders, plaintiff and inmate Richardson began to rise from the floor.  *Id*.  Because there were a number of weapons involved in the incident and in an effort to protect himself and others, defendant Siuda struck inmate Richardson across the back with his baton.  *Id*. at ¶ 82.  After all of the inmates were under control, defendant Siuda assisted defendant McLaughlin in applying restraints to inmate Richardson and defendants Siuda and McLaughlin escorted inmate Richardson to the frisk area.  *Id*. at ¶ 83.  Thereafter, defendants Siuda and McLaughlin escorted inmate Richardson to the facility hospital.  *Id*.  At no time did defendant Siuda strike plaintiff with a baton or have any involvement in restraining plaintiff.  *Id*. at ¶ 84.  Moreover, defendant Siuda was unable to open the gate to the visiting room.  *Id*. at ¶ 86.

### James O'Herron

On June 24, 2000, defendant O'Herron responded to a call to report to the SHU visiting room because of a disturbance.  Dkt. #45, ¶¶ 89-90.  When defendant O'Herron arrived at the SHU visiting room, he observed a number of inmates fighting in pen number one.  *Id*. at ¶ 91.  After the supervisor had authorized the gate to be opened, defendant O'Herron entered the visiting room with a number of other officers.  *Id*. at ¶ 93.  Immediately upon entering the visiting room, defendant O'Herron was

struck in the chest by inmate Matos who had broken free from defendants Augustine and Carrigan. *Id*. at ¶ 94. Thereafter, defendant O'Herron and Corrections Officer Lovejoy escorted inmate Roman to the frisk area. *Id*. at ¶ 95. At no time during the incident did defendant O'Herron have any contact with plaintiff. *Id*. at ¶ 96. Moreover, at all times relevant to the incident, defendant O'Herron did not have the ability to open the gate. At the conclusion of the incident, defendant O'Herron was sent to St. Joseph's Hospital to be treated for blood exposure. *Id*. at ¶ 99.


### **Bruce Dyer**

On June 24, 2000, defendant Dyer was on duty in the SHU visiting room where he was responsible for frisking and scanning inmates with a hand wand and controlling the inside, key operated gate leading from the frisk area to the sally-port area. Dkt. #45, ¶¶ 101-102. Once an inmate was frisked and scanned with a hand wand, defendant Dyer was responsible for opening the gate leading to the sally-port area and then closing the gate. *Id*. at ¶ 103. The sally-port gate was then electronically opened by a different officer and the inmate entered the area in front of the visiting pens. *Id*. Thereafter, a different officer electronically opened the gate to the visiting pen for the inmate to enter for his visit. *Id*. Defendant Dyer is required to always remain at his post and to operate the keyed gate leading from the frisk area to the sally-port area. *Id*. at ¶ 104. At all times during the June 24, 2000 incident, defendant Dyer remained at his post and operated the gate as he was required to do. Accordingly, at no time during the incident did defendant Dyer participate in the restraining or escorting

of plaintiff. Finally, defendant Dyer did not have the ability to open the electronically controlled gate to the visiting room, defendant Dyer was in charge of an entirely separate and distinct gate. *Id*. at ¶ 106.

### Dean MacIntyre

On June 24, 2000, defendant MacIntyre was assigned to the SHU visiting room where he was responsible for assigning seats to inmates and monitoring the visiting room area which consists of five pens. Dkt. #45, ¶ 109. In addition, defendant MacIntyre was responsible for informing the visitors which seats the inmates would be seated in and directing the visitors to seat themselves accordingly. *Id*. Visitors are first processed in a separate building where their belongings are searched and screened. *Id*. at ¶ 110. Following this initial screening, the visitors are then sent to the entrance area of the facility where they are sent through a metal detector and/or screened with a hand wand before being permitted to enter the visiting room area. *Id*. Defendant MacIntyre was not responsible for searching or screening any of the visitors, he was responsible for advising the visitors of the appropriate seats and for monitoring the visits. *Id*. at ¶ 111.

Immediately after the fight broke out in the SHU visiting room pen number one, defendant MacIntyre announced that a fight had broken out over the two-way radio system. *Id*. at ¶ 112. After being advised by defendant Augustine that weapons were involved, defendant MacIntyre made another announcement over the two-way radio.

*Id.* Thereafter, numerous Corrections Officers responded to the SHU visiting area to assist. *Id.* at ¶ 113. Defendant MacIntyre was not involved in securing the inmates involved in the fight, rather, he picked up the telephone and waited for the Sergeant (supervisor) to give the order to open the gate to pen number one. *Id.* at ¶ 114. When the Sergeant (supervisor) gave the order, defendant MacIntyre relayed the order to the visiting room control room and the gate was immediately opened. *Id.* Thereafter, defendant MacIntyre checked the visiting room for weapons and assisted in controlling the visitors that were present in the visiting room. *Id.* at ¶¶ 115 and 117. Defendant MacIntyre was not involved in any use of force concerning plaintiff or any other inmate and in fact, defendant MacIntyre had no contact whatsoever with any of the inmates. *Id.* at ¶ 116. With respect to plaintiff's claim that defendant MacIntyre failed to protect him because he failed to open the gate, defendant MacIntyre argues that as soon as he witnessed the incident he immediately radioed for assistance and as soon as the Sergeant gave the order to open the gate, defendant MacIntyre relayed that order and the gate was opened. *Id.* at ¶ 118. Defendant MacIntyre further states that he had no reason to suspect or know that any of the visitors had any weapons or that they had supplied weapons to the inmates. *Id.* at ¶ 119. Finally, defendant MacIntyre argues that he had no knowledge that any inmates were going to be attacked or that a fight would break out. *Id.*

**James Ameigh**

On June 24, 2000, defendant Ameigh was working in the guest area of the SHU visiting room. Dkt. #45, ¶ 121. Defendant Ameigh was responsible for coordinating and monitoring the visitors and he and the visitors were separated from the inmates by the pens. *Id*. Defendant Ameigh was not responsible for searching or screening any of the visitors. *Id*. at ¶ 123. After the fight broke out at approximately 2:30 p.m., on June 24, 2000, defendant Ameigh responded by attempting to control and keep the visitors away from the pens. *Id*. at ¶ 125. Defendant Ameigh did not have access to the area where the inmates were fighting and therefore he was not involved in securing the inmates. *Id*. at ¶ 128. Rather, he was responsible for securing the visitor's section of the visiting room. *Id*. Thus, defendant Ameigh was not involved in any use of force and had no contact with plaintiff. *Id*. at ¶ 129. Finally, defendant Ameigh insists that he immediately responded to the incident by keeping the visitors away from the pens and further, that he had no reason to know that any of the visitors had weapons or that they had supplied weapons to the inmates. *Id*.

**Robert Held**

On June 24, 2000, defendant Held was working in the Cadre Visit Room located at the opposite end of Southport from the SHU visiting room. Dkt. #45, ¶ 132. Defendant Held did not respond to the SHU visiting room after the incident occurred because his duties in the Cade Visit Room required him to remain there. *Id*. at ¶¶ 133-134. Defendant Held had absolutely no involvement in, nor does he have any first-

hand knowledge of the incident which took place on June 24, 2000 in the SHU visiting room. *Id*. at ¶ 135.

### Jodi Litwiler

At the time of the June 24, 2000 incident, defendant Litwiler was assigned to the Blood Exposure Response Team ("BERT"). Dkt. #45, ¶ 138. Defendant Litwiler was not on duty on June 24, 2000, however, she was contacted by the facility in her capacity as a member of the BERT and was notified about the incident that took place in the SHU visiting room. *Id*. at ¶¶ 139-140. As a member of the BERT, defendant Litwiler is responsible for assisting staff who have been exposed to blood during the course of their duties to ensure that the proper precautions are taken. *Id*. at ¶ 141. After being notified of the incident, defendant Litwiler responded to either the facility or directly to the hospital where the staff members who had been exposed to blood had been taken for the purpose of assisting them in obtaining the proper and necessary testing and treatment. *Id*. at ¶ 142. Other than as described above, defendant Litwiler had no personal involvement in the June 24, 2000 incident. *Id*. at ¶ 143.

### Wendy McKlevis

Defendant Wendy McKlevis was also assigned to the BERT. Dkt. #45, ¶ 144. At no time during the June 24, 2000 incident was defendant McKlevis in the SHU visiting room. *Id*. at ¶ 145. Defendant McKlevis was notified of the incident that

had taken place and in her capacity as a member of the BERT, she responded to assist

staff who had been exposed to blood to ensure that they received the proper and

necessary testing and treatment.  *Id*. at ¶¶ 148-149.  Other than as described above,

defendant McKlevis had no personal involvement in the June 24, 2000 incident.  *Id*. at

¶ 150.


## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,

140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party seeking to defeat a motion for summary judgment,

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989).  Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a

policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

## Defendants Held, Litwiler and McKlevis

It is undisputed that defendants Held, Litwiler and McKlevis had no personal involvement in the alleged constitutional violations set forth in plaintiff's complaint. On June 24, 2000, defendant Held was working in the Cadre Visit Room located at the opposite end of Southport from the SHU visiting room. Dkt. #45, ¶ 132. Defendant Held did not respond to the SHU visiting room after the incident occurred because his duties in the Cade Visit Room required him to remain there. *Id*. at ¶¶ 133-134. Defendant Held had absolutely no involvement in, nor does he have any first-hand knowledge of the incident which took place on June 24, 2000 in the SHU visiting room. *Id*. at ¶ 135. Defendant Litwiler was not on duty on June 24, 2000, however, she was contacted by the facility in her capacity as a member of the BERT and was notified about the incident that took place in the SHU visiting room. *Id*. at ¶¶ 139-140. After being notified of the incident, defendant Litwiler responded either to the facility or directly to the hospital where the staff members who had been exposed to blood had been taken to assist them in obtaining the proper and necessary testing and treatment.

*Id*. at ¶ 142.  Other than as described above, defendant Litwiler had no personal involvement in the June 24, 2000 incident.  *Id*. at ¶ 143.

Finally, as with defendant Litwiler, defendant McKlevis was also assigned to the BERT.  Dkt. #45, ¶ 144.  However, at no time during the June 24, 2000 incident was defendant McKlevis in the SHU visiting room.  *Id*. at ¶ 145.  Defendant McKlevis was notified of the incident and responded to assist staff who had been exposed to blood to ensure that they received the proper and necessary testing and treatment.  *Id*. at ¶¶ 148-149.  Other than as described above, defendant McKlevis had no personal involvement in the June 24, 2000 incident.  *Id*. at ¶ 150.  Accordingly, because there is no dispute that defendants Held, Litwiler and McKlevis had no personal involvement in the alleged constitutional violations set forth in plaintiff's complaint, the claims against defendants Held, Litwiler and McKlevis fail as a matter of law.

**Excessive Use of Force Claim**

A claim of cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution has both a subjective and objective component.  To satisfy the subjective component, a plaintiff must demonstrate that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009), *quoting Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) and *Wilson v. Seiter*, 501 U.S. 294, 299 (1991).  Whether conduct of

prison officials can be characterized by "wantonness" is determined by "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Wright,* 554 F.3d at 268, *quoting Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  The objective component of a claim of cruel and unusual punishment concentrates on the harm done in light of "contemporary standards of decency." *Wright*, 554 F.3d at 268, *quoting Hudson*, 803 U.S. at 8.

"Where a prisoners' allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak."  *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009), *citing Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) ("reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was 'thin' as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the 'medical records after the ... incident with [that officer] indicated only a slight injury'"); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) ("vacating district court's *sua sponte* dismissal of prisoner's complaint, though characterizing his 'excessive force claim [a]s weak and his evidence [as] extremely thin' where prisoner alleged that he was hit by prison guards 'after he was handcuffed' but 'the only injuries he suffered were a bruised shin and swelling over his left knee'").  Notwithstanding the foregoing, *"de minimis* uses of

physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind," is not proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment. *Hudson*, 503 U.S. at 10. Indeed, the Supreme Court has further elaborated, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id*. at 9.

Plaintiff's excessive use of force claim can be segregated into two distinct episodes, both of which presented an opportunity for plaintiff to sustain injuries distinct from those he suffered at the hands of his fellow inmates. First, is the time period after the fight between the inmates occurred and before the gate to the visiting room pen was opened, wherein plaintiff alleges that he sustained injuries by reason of defendants jabbing their batons through the cage. *See* Dkt. #1, ¶¶ 24-25. Second, is the time period after the officers entered the visiting room pen and secured the inmates. *Id*. at ¶¶ 27-32. As will be described in greater detail below, certain of the named defendants did not even arrive on the scene until after the gate had been opened and therefore, could not have been involved in the first part of plaintiff's alleged excessive use of force claim. Similarly, several of the named defendants were involved in securing and escorting other inmates and therefore, had no involvement whatsoever in securing and escorting plaintiff.

After the incident occurred and before the officers entered the visiting pen to secure the inmates, plaintiff alleges that,

[i]nstead of assisting plaintiff, the officers placed their batons in a horizontal position and began jabbing their batons through the holes in the cage which resulted in plaintiff being physically assaulted about his head, neck, and back. One particularly forceful jab caught plaintiff in his head causing him to almost lose consciousness (including the blurring of his vision) and forcing him to fall to his knees placing his head on one of the tables in the visiting area.

Dkt. #1, ¶¶ 24-25. Plaintiff's complaint does not, however, specify which officer or officers were allegedly "jabbing their batons through the holes in the cage" or which officer or officers struck plaintiff through the cage. *Id*. Because the events that occurred before the gate was opened were extremely confusing and chaotic, it is reasonable to conclude that, under the circumstances, plaintiff would be unable to identify which officers were "jabbing their batons through the holes in the cage" and more specifically, which officer or officers hit plaintiff before the gate was opened. Based upon the record before this Court, several of the defendants did not arrive on the scene until after the gate had been opened and therefore, those defendants could not have been among those defendants referenced in the allegations cited above. Similarly, other defendants, while they were present in the SHU visiting area, were assigned to other portions of the SHU visiting area with specific responsibilities and were not physically in a position to have caused the injuries plaintiff claims were caused by an officer or officers "jabbing their batons through the holes in the cage." Thus, based on the foregoing, issues of fact exist with respect to what transpired before the gate was opened.

Once the officers entered the visiting area, plaintiff alleges that he was "physically assaulted with batons by defendant Augustine and others as they entered the caged-in portion of the visiting area." *Id*. at ¶ 27. Plaintiff further alleges that,

> Plaintiff was then thrown/dragged out of the caged-in area into the area just outside the caged-in area where the correctional officers are posted to observe the visiting area. Plaintiff was pinned to the floor in the prone position with defendant correctional officers holding plaintiff firmly to the floor by leaning on and applying pressure to plaintiff's back and neck with their feet. ... While plaintiff was pinned to the floor, the defendant officers began to verbally assault and to physically assault plaintiff by yelling racial epithets and threats at plaintiff while kicking plaintiff about the ribs and back.

Dkt. #1, ¶¶ 29-32.

### **Defendants MacIntyre, Dyer, Ameigh, and Bartsch**

Defendant MacIntyre was assigned to the SHU visiting room where he was responsible for assigning inmates seats and monitoring the visiting room area which consists of five pens. Dkt. #45, ¶ 109. Immediately after the fight broke out in the SHU visiting room, pen number one, defendant MacIntyre announced that a fight had broken out over the two-way radio system. *Id*. at ¶ 112. Thereafter, numerous Corrections Officers responded to the SHU visiting area to assist. *Id*. at ¶ 113. Defendant MacIntyre was not involved in securing the inmates involved in the fight, rather, he picked up the telephone and waited for the Sergeant (supervisor) to give the order to open the gate to pen number one. *Id*. at ¶ 114. When the Sergeant (supervisor) gave the order, defendant MacIntyre relayed the order to the visiting room

control room (defendant Bartsch) and the gate was immediately opened. *Id*.

Thereafter, defendant MacIntyre checked the visiting room for weapons and assisted in

controlling the visitors that were present in the visiting room. *Id*. at ¶¶ 115 and 117.

Defendant MacIntyre had no contact whatsoever with any of the inmates. *Id*. at ¶ 116.

On June 24, 2000, defendant Ameigh was working in the guest area of

the SHU visiting room and was responsible for coordinating and monitoring the visitors.

Dkt. #45, ¶ 121. Defendant Ameigh and the visitors were separated from the inmates

by the pens. *Id*. After the fight broke out at approximately 2:30 p.m. on June 24, 2000,

defendant Ameigh responded by attempting to control and keep the visitors away from

the pens. *Id*. at ¶ 125. Defendant Ameigh did not have access to the area where the

inmates were fighting and therefore, was not involved in any way with the inmates. *Id*.

at ¶ 128. Rather, he was responsible for securing the visitor's section of the visiting

room. *Id*.

On June 24, 2000, defendant Dyer was on duty in the SHU visiting room

where he was responsible for frisking and scanning inmates with a hand wand and

controlling the inside, key operated gate leading from the frisk area to the sally-port

area. Dkt. #45, ¶¶ 101-102. Defendant Dyer was also responsible for opening and

closing the gate leading to the sally-port area. *Id*. at ¶ 103. The sally-port gate was

then electronically opened by a different officer to allow the inmate to enter the area in

front of the visiting pens. *Id*. Thereafter, a different officer electronically opens the gate

to the visiting pen for the inmate to enter for his visit. *Id*. Defendant Dyer is required to always remain at his post and to operate the keyed gate leading from the frisk area to the sally-port area. *Id*. at ¶ 104. At all times during the June 24, 2000 incident, defendant Dyer remained at his post and operated the gate as he was required to do.

Finally, on June 24, 2000, defendant Bartsch was assigned to the control room for the Southport visiting pens and the visiting area. Dkt. #45, ¶ 25. Specifically, defendant Bartsch was responsible for operating the gates from the main gallery to the visiting area and from the visiting area to the visiting pens. *Id*. In support of defendants' motion for summary judgment, defendant Bartsch states,

> [w]hile in the control room, my job is to properly identify the inmate being processed into the visiting room and to operate certain gates. To maintain the safety and security of the facility, I am absolutely prohibited from opening the gates to the visiting pens if an incident occurs, unless ordered to do so by the area supervisor.

Dkt. #47, ¶ 5. Thus, defendant Bartsch had no contact whatsoever with any inmates in connection with the June 24, 2000 incident.

As discussed above, absent a showing of personal involvement in an alleged constitutional deprivation, a plaintiff may not be awarded damages under § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989); *see* pp.22-23, *supra*. For the reasons set forth above, plaintiff's excessive use of force claim against defendants MacIntyre, Dyer, Ameigh and Bartsch relating to

the time period after the incident and before the gate to the visiting pen was opened, fails as a matter of law for lack of personal involvement.

### Defendants Augustine, Siuda, McKernan, O'Herron, Warren, Carrigan, Michalko and McLaughlin

It is undisputed that defendants Augustine, Siuda, McKernan, O'Herron, Warren, Carrigan, Michalko and McLaughlin were all either assigned to or responded to the SHU visiting room on June 24, 2000. Specifically, defendant Augustine was assigned to the SHU visiting room and defendants Siuda, McKernan, O'Herron, Warren, Carrigan and Michalko all responded to the SHU visiting area upon learning that a fight had broken out among the inmates. With the exception of defendants Michalko and McLaughlin, each of the other above-named defendants arrived at the SHU visiting area before the gate to the visiting room pen was opened and, according to plaintiff's allegations, could have been among those defendants "jabbing their batons through the holes in the cage." Dkt. #1, ¶¶ 24-25. Based upon the allegations in plaintiff's complaint, as well as the affidavits submitted in support of defendants' motion for summary judgment, the events that took place before the gate was opened are clouded with confusion. Questions of fact remain as to which inmates complied (or initially complied) with defendants' orders, what actions were taken by the Corrections Officers who responded and who, if anyone, used force on plaintiff before the gate was opened. If indeed force was used on plaintiff, further questions of fact remain with respect to whether the force used was excessive.

Defendant Michalko did not arrive until after the gate had been opened and he did not enter the visiting room pen. Dkt. #45, ¶ 43. Defendant Michalko did, however, assist defendant Warren in escorting plaintiff to the facility hospital. *Id*. at ¶ 46. Other than defendant Augustine who was assigned to the SHU visiting area, defendant Siuda stated that he was one of the first to enter the SHU visiting room pen with defendant Augustine. Dkt. #45, ¶ 80. Defendants McKernan, O'Herron, Warren and Carrigan each stated that at the time they arrived at the SHU visiting area, they observed the inmates fighting in pen number one and that after the gate had been opened they all entered the area and attempted to subdue the inmates. Dkt. #45, ¶¶ 32, 34, 51, 68, 70, 91, and 93.

Other than plaintiff identifying defendant Augustine, the complaint does not specify which defendants were involved in the "physical assault" that took place after the officers entered the visiting area. In support of their motion for summary judgment, defendants argue that because only defendants Augustine, Warren and Michalko had any physical contact with plaintiff, the claims against the remaining defendants should be dismissed due to a lack of personal involvement. Dkt. #46, pp.10-11. There is no dispute that defendant Michalko arrived after the gate had been opened and assisted Officer Warren in escorting plaintiff to the facility hospital. Dkt. #45, ¶ 46. It is equally undisputed that at the time defendant McLaughlin arrived at the SHU visiting room, other officers were already in the SHU visiting room and defendant McLaughlin assisted in applying restraints to inmate Richardson and escorting inmate Richardson to the frisk area. Dkt. #45, ¶¶ 58-60.

Moreover, defendants Augustine, Siuda, McKernan, O'Herron, Warren and Carrigan were present at the SHU visiting room area prior to the opening of the gate and entered the area after the gate had been opened. Based upon the record before this Court, issues of fact remain with respect to what transpired between plaintiff and defendants Augustine, Siuda, McKernan, O'Herron, Warren and Carrigan both before the gate was opened and after and what transpired between plaintiff and defendants Michalko and McLaughlin after the gate was opened. Accordingly, defendants' motion for summary judgment on plaintiff's excessive use of force claim against defendants Augustine, Siuda, McKernan, O'Herron, Warren, Carrigan, Michalko and McLaughlin is denied.

**Failure to Protect (Conditions of Confinement) Claim**

The Eighth Amendment prohibits cruel and unusual punishment that involves the unnecessary and wanton infliction of pain. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Eighth Amendment to the United States Constitution imposes the duty on prison officials to provide humane conditions of confinement and officials must ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In order to prevail on a claim of a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective component. First, the deprivation must be, objectively, sufficiently serious, such as "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id*. at 834, *citing Rhodes*, 452 U.S. at 347. The second component

requires that the prison official have a "sufficiently culpable state of mind." *Id*. In cases such as this, the state of mind is one of deliberate indifference to the health and safety of an inmate. *Id*.

Conditions of confinement inflict cruel and unusual punishment when they result "in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are "restrictive and even harsh" are "part of the penalty that criminal offenders pay for their offenses against society." *Id*. With respect to the subjective component, a prison official will not be held liable for inhumane conditions, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Supreme Court of the United States adopted "subjective recklessness" as is used in criminal law as the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839-40.

In the instant case, plaintiff's complaint fails to satisfy both the objective and subjective components of a failure to protect claim. As a threshold matter, plaintiff's complaint is devoid of any allegations to support a conclusion that the deprivation was sufficiently serious so as to result in the "denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834; *citing Rhodes*, 452 U.S. at

347.  In fact, plaintiff's complaint recounts the security measures taken by prison staff before an inmate is permitted entry into the SHU visiting area.  Dkt. #1, ¶¶ 13-14.  Specifically, plaintiff alleges and it is undisputed that plaintiff was pat-frisked and then had five-point restraints placed on his wrists, waist and ankles before he was escorted to the visiting area.  *Id*. at ¶ 13.  Once he arrived at the visiting area, plaintiff alleges and it is undisputed that plaintiff was pat-frisked again and then scanned with a hand-held metal detector before being placed in the "caged-in area where inmates are designated to sit when in the visiting area."  *Id*. at ¶ 14.  On June 24, 2000, defendant Dyer was responsible for frisking and conducting the hand-wand check of all the inmates entering and leaving the visiting area.

The guests are first screened in a separate building where their personal belongings are searched and scanned.  Dkt. #45, ¶¶ 110 and 122.  Following that initial screening, the visitors are then sent to the entrance area of the facility where they proceed through a metal detector and/or are screened with a hand wand before they are permitted to enter the guest visiting area.  *Id*.  None of the defendants named in plaintiff's complaint were involved in the searching, screening or processing of the guests on June 24, 2000.  Specifically, neither defendant MacIntyre nor defendant Ameigh were responsible for the searching, screening or processing of the guests, once the guests arrived at the visiting area, they had already been searched, screened and processed.  Dkt. #45, ¶¶ 111 and 123.  As revealed in a subsequent investigation of the June 24, 2000 incident, one of the guests smuggled in a razor blade which she gave to her son, inmate Matos, and a plexiglass shank which she gave to inmate Lugo.  *Id*. at

¶ 13.  In addition, it was determined that inmate Richardson retrieved a weapon from his rectum which he had smuggled into the visiting area.  *Id*. at ¶ 14.  Today, Southport is equipped with what is commonly referred to as a "boss chair" which can detect weapons being concealed in an anal cavity or rectum.  *Id*. at ¶ 15.  All inmates are now required to slide their bottom across the "boss chair" prior to entering and leaving the visiting room.  *Id*.  At the time of the June 24, 2000 incident, Southport did not have a "boss chair."  *Id*.

As argued by defendants in support of their motion for summary judgment, each of the defendants who were stationed in the SHU visiting area (defendants Augustine, MacIntyre and Ameigh) and at the inmate entrance to the SHU visiting area (defendant Dyer) on June 24, 2000 satisfied their respective responsibilities and did not create conditions that posed a substantial risk of harm to plaintiff.  Dkt. #46, p.14.  Moreover, it is undisputed that none of the named defendants searched, screened or processed the guests and that the inmates were pat-frisked and scanned consistent with the technology available at that time.  Thus, there is no evidence in the record before this Court to suggest that those responsible for screening the inmates entering the visiting room or monitoring the visiting room created conditions that posed a substantial risk of harm to plaintiff.

In order to satisfy the subjective component, a plaintiff must demonstrate that the prison official knew of and disregarded an excessive risk to inmate health or safety.  Specifically, "the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As established by the Supreme Court of the United States, "subjective recklessness" is the test for "deliberate indifference" under the Eighth Amendment. *Id*. at 839-40. The record before this Court is simply devoid of any evidence to support the conclusion that any of the defendants had any knowledge that plaintiff faced a substantial risk of harm and that defendants disregarded that risk.

In addition to the allegations that defendants failed to protect plaintiff from the harm he suffered at the hands of the other inmates while in the SHU visiting room, plaintiff further alleges that defendants failed to protect plaintiff in that they refused and/or failed to open that gate to the visiting room pen to allow him to escape the melee. Fatal to plaintiff's claim, however, is the undisputed fact that none of the defendants had the authority or the ability to open the gate to the visiting room pen. The gate to the visiting room pen was electronically controlled and only supervisors had the ability to instruct that the gate be opened. Here, once sufficient staff arrived to assist, the supervisor on duty instructed defendant Bartsch, who was assigned to the control room, to open the gate to the visiting pens to allow the Corrections Officers who responded to the incident to enter the area. Dkt. #45, ¶ 28. Moreover, the undisputed facts illustrate that at the time the fight broke out, defendant MacIntyre immediately announced over the two-way radio what had occurred and requested officer assistance. *Id*. at ¶ 112. Thereafter, it is equally undisputed that officers responded to the SHU visiting room and once the gate was opened, entered the area and secured the

inmates. Dkt. #46, p.17. Finally, as soon as all the participants in the fight were secured, those in need of medical attention, including plaintiff, were taken to the facility hospital and/or the Arnot Ogden Medical Center for treatment. Dkt. #1, ¶¶ 35-36.

For the following reasons, plaintiff has failed to demonstrate that he can satisfy both the objective and subjective components of a failure to protect claim. In fact, the record before this Court is devoid of any evidence that any of the defendants had knowledge that plaintiff faced a substantial risk of serious harm and that the defendants disregarded that risk by failing to take reasonable measures. Thus, plaintiff's failure to protect claim fails as a matter of law and must be dismissed.

**Qualified Immunity**

Finally, defendants claim that they are entitled to qualified immunity because they acted in an objectively reasonable manner at the time of their actions and that "defendants took appropriate measures to regain peace, order and security, to protect themselves and others, and to quell the violent disturbance in which plaintiff was involved." Dkt. #46, p.22. Moreover, defendants maintain that it was objectively reasonable for the defendants to believe that their acts did not violate any of plaintiff's constitutional rights. *Id.*

Government officials are "'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 614,

119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), *quoting Harlow v. Fitzgerald*, 457 U.S. 800,

818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> The qualified immunity defense requires consideration of the
> clarity of the law establishing the right allegedly violated and
> whether a reasonable person, acting under the
> circumstances then confronting a defendant, would have
> understood that the applicable law was being violated.
> These inquiries combine to form a standard that the
> Supreme Court has called "objective legal reasonableness,"
> that is, whether it was objectively reasonable for a defendant
> to think that the challenged conduct did not violate the
> plaintiff's clearly established rights.

*Vega v. Miller*, 273 F.3d 460, 466 (2d Cir.2001) (internal citations omitted).  A defendant

is entitled to qualified immunity if (1) his or her actions did not violate clearly established

law or (2) it was objectively reasonable to believe that his or her actions did not violate

such law.  *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir.1999). It has been said that:

> The contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing
> violates that right. This is not to say that an official action is
> protected by qualified immunity unless the very action in
> question has previously been held unlawful, ... but it is to say
> that in the light of pre-existing law the unlawfulness must be
> apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

(citations omitted). Thus, the doctrine of qualified immunity operates to ensure that

before they are subjected to suit, officers are on notice that their conduct is unlawful.

*Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).


In the instant case, the Court has no doubt that reasonable prison officials

would understand that the malicious and sadistic use of force, as plaintiff asserts,

constitutes a violation of the Eighth Amendment.  Accordingly, defendants are not entitled to qualified immunity on the current record.

## CONCLUSION

For the foregoing reasons, defendants' motion  for summary judgment (Dkt. #44) is **GRANTED** in part and **DENIED** in part as follows.  Plaintiff's claims against defendants Held, Litwiler and McKlevis are dismissed in their entirety.  Defendants' motion for summary judgment on plaintiff's failure to protect claim is granted in its entirety.  Defendants' motion for summary judgment on plaintiff's excessive use of force claim is granted with respect to defendants MacIntyre, Dyer, Ameigh and Bartsch and denied with respect to defendants Augustine, Siuda,  McKernan, O'Herron, Warren, Carrigan, Michalko and McLaughlin.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

DATED:     Buffalo, New York
                June 23, 2009


**s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**